S99A1050. BROOKS et al. v. JULIAN et al.
(523 SE2d 862)

SEARS, Justice.

Emma Lou Brooks and Sherrill Sheffield, propounders of the 1994 will of their mother, Lynell Moore, appeal the trial court's judgment denying probate based upon the jury's finding that the will was procured by undue influence. Having closely reviewed the record, we conclude that because there was insufficient evidence to support the jury's finding, the trial court erred in denying the propounders' motion for judgment notwithstanding the verdict. Therefore, we reverse.

Until 1991, Lynell Moore lived alone in rural Montgomery County, Georgia, while three of her four adult daughters lived in Florida, and one daughter lived in North Carolina. The evidence of record overwhelmingly indicates that Moore was quite independent, capable of handling her own affairs, and in good mental and physical health. Moore owned two parcels of property used for timber production and certificates of deposit valued at roughly $140,000. Moore had no will at that time, and listed no beneficiaries on her CDs.

In 1991, Moore's daughter Sarah Lancaster (a caveator) moved from Florida to Moore's home town. One month later, Lancaster's name was added to her mother's checking account, and she was authorized to enter her mother's safe deposit box without her mother being present. Also in April 1991, Moore listed each of her four daughters as beneficiaries on her CDs. Between April 1991 and July

1993, Lancaster entered her mother's safe deposit box several times without her mother being present, as she was authorized to do. In 1993, Moore made her first will, in which she devised everything to her four daughters in equal shares. Moore's eldest daughter, Brooks, was named executor of the will.

On August 8, 1994, Brooks received a telephone call from the manager of a bank where her mother maintained an account. Telephone records confirm that a call lasting approximately nine minutes was made from the bank to Brooks's residence on that day. Brooks claims the manager told her that she should come to her mother's home town immediately in order to look after her mother's financial interests. When Brooks arrived, she and Moore went to the bank, and discovered that Moore's safe deposit box had been emptied. Moore and Brooks then met with the attorney who had drafted the 1993 will. As a result of that meeting, a letter was sent to Lancaster telling her to cease all contact with her mother. The attorney testified that at the time of their August 1994 meeting, Moore was competent, although she was clearly angry with both Lancaster and her daughter, Peggy Julian, whom Moore believed sympathized with Lancaster.

On August 26, 1994, Moore had a second meeting with the same attorney. She met alone with the attorney, and instructed him to redraft her will so as to leave her entire estate to her daughters Brooks and Sheffield (collectively "Propounders"), and to disinherit her daughters Lancaster and Julian (collectively "Caveators"). Again, Brooks was named executor of the will. Moore executed the new will ("the 1994 will") on that same day. Both the lawyer and his administrative assistant were well acquainted with Moore, having dealt with her professionally for a number of years. They both testified that Moore appeared altogether competent at the time the 1994 will was drafted and executed, and that they perceived nothing out of the ordinary in Moore's behavior on the day she directed that her will be changed. They also testified that Moore instructed that her will be changed because she believed Lancaster had attempted to control her affairs, and had taken items both from her safe deposit box and her home.[1]

Lancaster testified at trial that before the bank manager telephoned Brooks, she had accompanied Moore to the bank because Moore wanted to transfer the money invested in matured CDs she kept in the bank's safe deposit box to another bank which offered a

---

[1] At this same time, Moore executed a deed to her home and a 200 acre parcel of land in favor of Propounders, after reserving a life estate to herself. This Court has previously ruled that the Caveators cannot maintain a suit to cancel those deeds unless and until they prevail on their challenge to the probate of the 1994 will. *Julian v. Brooks*, 269 Ga. 167 (495 SE2d 569) (1998).

slightly higher interest rate. Lancaster testified that Moore was ada-
mant about obtaining the best possible interest rate on her invest-
ments, and that when she helped her mother remove the certificates
from the safe deposit box, she was merely doing as her mother
wished. She also testified that her mother had lost her key to the
deposit box, and had become upset when bank officials had to drill
the box open. Despite a private investigation into the matter, con-
ducted at Brooks's direction, no evidence of wrongdoing by Lancaster
was ever uncovered. In time, all of Moore's investments were
accounted for and the record contains no direct evidence that her
finances were misappropriated.

Moore died in January 1996. Probate of the 1994 will was chal-
lenged by the Caveators. The probate court admitted the 1994 will
for probate, and the Caveators appealed to the Superior Court of
Montgomery County. At the conclusion of evidence, the trial court
directed a verdict in favor of the Propounders on the issues of mis-
take of conduct and actual fraud in the making of the 1994 will, but
allowed the issue of undue influence to go to the jury. After the jury
returned a verdict in favor of the Caveators on that issue, the trial
court denied the Propounders' j.n.o.v. motion and motion for new
trial.[2]

Because the right to make a will is extremely valuable, a high
standard must be applied in order to deprive a testator of that right.[3]
Undue influence upon a testator can be found to exist only if such
influence constrained or coerced " 'a person into doing that which his
[or her] best judgment tells him not to do and deprives him of his free
agency and substitutes the will of another person for his own.' "[4]
Undue influence can invalidate a will only if it operates on the mind
of the testatrix at the time she executes the document.[5] Evidence of
undue influence over the mind of a testatrix at any other time cannot
invalidate a will.[6]

---

[2] At trial, the Caveators entered into the following stipulation, which was read to the
jury before the introduction of evidence:

> Caveators admit a prima facie case and, in so doing, admit the execution with due
> formality of a paper purporting to be a will by a person apparently of sound mind at
> the time of execution and that they, the Caveators, assume the burden of going for-
> ward with evidence to overcome the rebuttable presumption that the testatrix had
> the requisite capacity with proof of undue influence or fraud or mistake as to the
> conduct of either or both of the Caveators who are heirs at law of the testatrix.

The trial court then explained to the jury, "All that means is that they have assumed the
burden of rebutting the presumption that the will was created by someone of sound mind."

[3] *Bohlen v. Spears*, 270 Ga. 322, 324 (509 SE2d 628) (1998) (quoting *McConnell v.
Moore*, 267 Ga. 839, 840 (483 SE2d 578) (1997)).

[4] *Bohlen*, supra; *McConnell*, supra.

[5] *Bohlen*, supra; *McConnell*, supra; *Boland v. Aycock*, 191 Ga. 327, 329 (12 SE2d 319)
(1940).

[6] *McConnell*, 267 Ga. at 841.

The record in this matter is void of any direct evidence that Brooks exerted undue influence over Moore at the time Moore executed the 1994 will. To the contrary, the attorney who drafted the 1994 will at Moore's direction and his assistant who witnessed the 1994 will, both of whom were well acquainted with Moore, testified that Moore understood what she was doing at the time she changed her will, and made the changes voluntarily and of her own free choice after reflecting upon the consequences of her actions. The lawyer specifically testified that he had no doubt that Moore possessed the capacity to fully understand what she was doing at the time she executed the 1994 will. He also testified that in his dealings with her, Moore behaved like a "very strong-minded person . . . [not] very susceptible to being controlled" by others, and that her behavior on August 26, 1994, was consistent with that characterization. The lawyer's assistant testified that when she changed her will, Moore acted in a clear headed, determined and purposeful manner, and did not appear to be under the control of anyone else.

Caveators urge that Brooks's arrival in Georgia immediately before Moore changed her will is suspicious and gives rise to an inference of undue influence. However, this Court has long held that "the indulgence of [the] mere suspicion of undue influence cannot be allowed"[7] to supplant direct evidence on the issue. Similarly, the mere existence of a confidential relationship between Brooks and Moore also is insufficient to invalidate the 1994 will.[8]

Caveators point to two witnesses who claim they perceived instances when Moore acted as if she were confused. However, neither of those purported instances relates directly to Moore's state of mind on August 24, 1994, when she executed her 1994 will.[9] Nor do either of the alleged instances indicate that Brooks exerted undue influence over Moore. Accordingly, the uncontradicted evidence concerning Moore's August 26, 1994, redrafting and execution of her will is that she directed her lawyer to change the will and executed it knowingly, freely, and voluntarily; that Brooks did not participate in the preparation or execution of the will; and that Moore was of sound mind at the time the will was prepared and executed.[10]

As noted above, no evidence shows conclusively that Lancaster engaged in wrongdoing with respect to Moore's finances and invest-

---

[7] *McConnell*, 267 Ga. at 841 (quoting *Dean v. Morsman*, 254 Ga. 169, 173 (327 SE2d 212) (1985)).

[8] Id.

[9] One of the instances was recounted by a witness who did not know Moore and could not state exactly when he observed Moore behaving confused, only that he believed it was in the "August 1994 time frame." The other instance was alleged by a different witness to have occurred five months after execution of the 1994 will.

[10] See *Bohlen*, 270 Ga. at 324.

ments. Despite this, Moore indicated to her attorney that she was changing her will in August 1994 to disinherit two of her daughters because she believed that Lancaster was "trying to take her business over." Even though Moore might have been mistaken in that belief, it is clear that such a mistake resulted "from an error of judgment after investigation or from negligent or wilful failure to make a proper investigation by means of which the truth could be readily and surely ascertained"[11] before execution of the 1994 will. As such, even if Moore's belief in Lancaster's deception was inaccurate, it affords no basis for invalidating the 1994 will.

For the reasons discussed above, and in light of the principle that a stringent standard must be met in order to deprive a person of the valuable right to make a will, we conclude that the evidence was insufficient to support a finding of undue influence and deprive Moore of her right to make a will of her own choosing. The evidence being insufficient, the trial court erred in denying the Propounders' motion for judgment notwithstanding the verdict.

*Judgment reversed. All the Justices concur, except Carley and Hines, JJ., who dissent.*

HINES, Justice, dissenting.

I respectfully dissent because the evidence authorized the jury to find undue influence.

Generally, the question of undue influence is for the fact finder. *Mathis v. Hammond*, 268 Ga. 158, 160 (3) (486 SE2d 356) (1997). Evidence of the testatrix's diminished mental capacity is relevant to the exercise of undue influence because the amount of influence which may dominate a mind impaired by age or disease may be decidedly less than that required to control a strong mind. *Murchison v. Smith*, 270 Ga. 169, 171-172 (508 SE2d 641) (1998).

The majority states that there is no direct evidence that Brooks exercised undue influence over the testatrix at the time of her execution of the 1994 will. However, a caveat based on undue influence may properly be supported by circumstantial evidence, as such influence can seldom be shown except by circumstantial evidence. *Skelton v. Skelton*, 251 Ga. 631, 634 (5) (308 SE2d 838) (1983). See also *Mathis*, supra at 160 (3). *McConnell v. Moore*, 267 Ga. 839 (483 SE2d 578) (1997), cited by the majority, does not stand for the proposition that direct evidence of undue influence is necessary. While the undue influence must be operating on the testatrix's mind at the time she executes her will, evidence of that influence is not confined to observations made at the instant the testatrix signs the will. Determining

---

[11] *Yancey v. Hall*, 265 Ga. 466, 470 (458 SE2d 121) (1995).

whether such influence was actually operating on the testatrix at the time of execution is the role of the fact finder, not this Court.

Viewing the evidence to support the verdict, as this Court is obligated to do, see *Sims v. Sims*, 265 Ga. 55 (452 SE2d 761) (1995), the evidence showed that within a month of the will's execution, testatrix Moore appeared to be confused and deferred to Brooks in dealing with the attorney who was hired to investigate Lancaster's involvement in Moore's finances; the attorney believed Moore did not understand what was going on. Five months later, when Moore was administered a mental status questionnaire by a nurse, Moore did not know the date, the day of the week, her telephone number or address, her age, or the current or previous presidents of the United States. Evidence of the testatrix's state of mind during a reasonable period of time before and after the execution of the will may be introduced to show her state of mind at the time of execution. *Bishop v. Kenny*, 266 Ga. 231 (1) (466 SE2d 581) (1996).

Evidence of Brooks's behavior is also telling. She accompanied Moore to the attorney's office the day the will was changed and Moore's real property became titled in Brooks and Sheffield. When Brooks transferred some of Moore's funds to a bank in Jacksonville, Florida, where Brooks resided, she showed the owner of the certificate of deposit as "EST OF MRS LYNELL M MOORE, INCAPACITATED"; this was done on August 31, 1994, five days after the will was executed. Although Brooks testified, in essence, that this was the bank's normal way of listing ownership when the owner may not be capable of fully controlling the property during the period of deposit, this listing was only after Brooks described her mother's situation to the bank. The jury was authorized to disbelieve Brooks's explanation for the listing and find that at the time of the will's execution, Brooks considered her mother to be incapacitated. Brooks also testified that her mother "was with me telling me" to arrange for the title to the testatrix's real property to be put in Brooks's and Sheffield's names. As the jury could believe that Brooks in fact believed her mother to be incapacitated at this time, it could infer that Brooks was untruthful about Moore's desires and that Brooks exerted undue influence on her incapacitated mother to effect the property transfer and the change in the will.

Additionally, the attorney who investigated Lancaster's involvement with the testatrix's finances testified that he informed Brooks that he found no evidence of wrongdoing; he did not communicate directly with Moore. But Brooks testified that she received no information from the attorney. Accordingly, it was for the jury to resolve this conflict in the evidence, and the jury was authorized to conclude that Brooks had received information that there was no evidence of impropriety by Lancaster, and yet did not relay that information to

Moore. Also, the jury had the benefit of viewing Brooks's demeanor while testifying, and could judge for itself her credibility, as well as that of the other witnesses. To, in essence, grant judgment notwithstanding the verdict in this case usurps the jury's role, ignores precedent from this Court, and miscasts the evidence at trial. I would not do it.

I am authorized to state that Justice Carley joins in this dissent.

DECIDED NOVEMBER 15, 1999 —
RECONSIDERATION DENIED DECEMBER 17, 1999.

*Straughan & Straughan, Mark W. Straughan,* for appellants.
*William T. Whatley,* for appellees.